Burch & Johnson, for plaintiffs.

---

(Superior Court of Cincinnati.)
General Term, 1900.
CINCINNATI v. E. A. FERGUSON et al.
Reservation from Special Term.

The act of April 23, 1898, O. L., 637, does not authorize the board of trustees of the Cincinnati Southern Railway to borrow a sum not exceeding two millions, five hundred thousand dollars, and to issue bonds for the same for the purpose of constructing terminal facilities for said railway, unless the said board of trustees have previously entered into an agreement with the lessee of said road by which agreement the lessee agrees to pay to said board of trustees each year, by way of additional rent, an amount sufficient to pay the interest on the bonds and provide a sinking fund sufficient to pay the interest on the bonds at their maturity; and the question of the issue of the bonds shall have been approved by the Trustees of the Sinking Fund of Cincinnati and approved by the people of Cincinnati at an election at which such question was submitted to them.

---

SMITH, J.
JACKSON, J., and DEMPSEY, J., concur.

This case comes before us on a reservation from special term, where it was submitted under the provisions of Sec. 5207, Rev. Stat., which is as follows:

"Parties to a question which might be the subject of a civil action may, without action, agree upon a case containing the facts upon which the controversy depends and present a submission of the same to any court which would have jurisdiction if an action were brought; but it must appear by affidavit that the controversy is real and the proceedings in good faith, to determine the rights of the parties; and the court shall thereupon hear and determine the case, and render judgment as if an action were pending.

The agreed statement of the facts is as follows:

"That the city of Cincinnati is a city of the first grade of the first class under the laws of the state of Ohio; and that under the provisions of an act of the general assembly of said state passed May 4, 1869, 66 O.L., 1869, said city duly constructed the Cincinnati Southern Railway between Chattanooga, Tennessee, and Cincinnati, Ohio; and that E. A. Ferguson, John Carlisle, Harry R. Smith, Thomas Morrison and John R. Sayler are now the duly appointed qualified and acting trustees of said, The Cincinnati Southern Railway.

"That on October 11, 1881, the trustees of the Cincinnati Southern Railway, under and in pursuance of an act of the general assembly of the state of Ohio, passed on March 18, 1881, entitled, "An act supplementary to the act relating to cities of the first class having a population exceeding one hundred and fifty thousand inhabitants passed May 4, 1869, with the approval of the trustees of the sinking fund of the city of Cincinnati, and for and in consideration of the rents, covenants and agreements contained in an indenture between the said trustees of the Cincinnati Southern Railway and the Cincinnati, New Orleans and Texas Pacific Railway Company, did thereby grant, demise and lease unto said company for a term of twenty-five years from October 12, 1881, the line of railway known as the Cincinnati Southern Railway, extending from its terminus in Cincinnati, Hamilton county, Ohio, to its terminus in Chattanooga, in the county of Hamilton, in the state of Tennessee, together with all the works, conveniences and appendages of said railway.

"That there was passed by the general assembly of the state of Ohio on April 23, 1898, 93 O. L., 637, an act entitled, 'An act supplementary to an act relating to cities of the first class having a population exceeding one hundred and fifty thousand inhabitants' passed May 4, 1869, 66 O. L., 80, and is as follows:

"'SECTION 1. Be it enacted by the general assembly of the state of Ohio that the board of trustees of any railway appointed under the provisions of the act to which this act is supplementary, be and they are herby authorized, with the approval of the trustees of the sinking fund of said city, to agree with the lessees of any such railway to modify the terms and extend the time of grant in any lease thereof for such length of time and upon such terms and conditions as shall be fixed and provided by said board of trustees; provided, however, that no modification or extension of said lease shall be made until the question of making such extension or modification shall be submitted to a vote of the qualified electors of said city at a general election held in said city after the making of the agreement aforesaid. The mayor of said city shall, upon notice given him of the making of the agreement aforesaid, give at least twenty days' notice of the time of hold-

nig such election to the qualified electors of the said city. The vote shall be taken at the usual time and place of holding elections in each precinct and ward of said city, and in the usual manner of holding state and municipal elections; and the ballots for such elections shall have printed thereon the words: 'shall the lease of the — be extended and modified? Yes. No.' (Inserting in said blank space the name of said line of railway.) And no such extension or modification shall be binding or take effect unless a majority of all votes cast upon the question at said election shall be cast in favor thereof. The returns of said election shall be made to the board of elections of said city, which shall canvass the same and report the result to the mayor thereof, and if a majority of the electors voting upon the question at such election shall have voted in favor of such extension and modification, the said board of trustees are hereby authorized to so extend and modify said lease and to execute all necessary paper writings therefor.

"'SECTION 2. It shall be lawful for the board of trustees appointed under the act to which this is supplementary, and they are hereby authorized to borrow as a fund for terminal facilities and permanent betterments for said line of railway, in addition to the sums heretofore authorized, a sum not to exceed two million, five hundred thousand dollars, and to issue bonds therefor in the name and under the corporate seal of the city owning the line of railway; said bonds shall be signed and attested in the same manner as the bonds authorized by the act to which this is supplementary, and shall be secured by a pledge of the faith of the city and a tax in addition to all other taxes for municipal purposes, which shall be annually levied by the council or board of legislation of said city on the real and personal property returned on the grand levy sufficient to pay the interest and provide a sinking fund for their final redemption, and they shall be payable both as to principal and interest in any lawful money of the United States, at such times and places and in such sums as shall be deemed best by said board; provided, that none of the bonds authorized by this act shall bear a greater interest than four per cent. per annum, nor be sold for less than par, and, provided further, that no more than five hundred thousand dollars shall be borrowed or bonds issued therefor in any one year.

"'SECTION 3. The trustees of said railway are hereby authorized and empowered to agree with any lessee of said line of railway that they will exercise the powers granted them in section 2 of this act, on condition that the said lessee company will enter into a supplementary agreement with said trustees by which said lessee company will obligate itself as and by way of additional rental for said line of railway, to pay said trustees such sum annually as will equal the interest charge upon said bonds and provide a sinking fund for their redemption at maturity.

"'SECTION 4. Upon making the agreement provided for in the preceding section, it shall be submitted to the trustees of the sinking fund of said city for their approval. If the said trustees of the sinking fund approve said agreement, or if they fail so to do within ten days thereof, notice thereof shall be given by the trustees of the railway to the mayor of the city. Said notice shall contain a copy of the agreement aforesaid, and of the approval, or the fact of the failure to approve. The mayor of said city shall thereupon submit the question of the issuance of the bonds provided for in section 2 of this act, to a vote of the qualified electors of said city at a general election held in said city. The mayor shall give at least twenty days' notice of the time of holding such election, and said notice shall contain a copy of the agreement provided for in section 3 of this act, and the approval aforesaid of the trustees of the sinking fund or the fact of their failure to approve. The vote shall be taken at the usual place of holding such elections in each precinct and ward of said city, and in the usual manner of holding state and municipal elections, and the ballots for such elections shall have printed thereon the words: 'shall bonds for terminal facilities and permanent betterments for the —— be issued? Yes. No.' (Inserting in said blank space the name of said line of railway.) And no bonds shall be issued under this act unless a majority of all the votes cast upon the question at said election shall be cast in favor thereof. The returns of said election shall be made to the board of elections of said city, which shall canvass the same and report the result to the mayor thereof, who shall transmit same to the trustees of said railway.

"'SECTION 5. The said trustees shall expend the said fund in providing terminal facilities for said railway, and in making permanent betterments upon the line thereof, and they shall have the same powers in the expenditure thereof as they had with reference to the fund expended under the provisions of the act to which this is supplementary.

"'SECTION 6. The trustees of any such railway shall have the power, and they are hereby authorized, in case the same shall become necessary, in order to protect the interests of such city under any lease and mortgage which may have been made under and by virtue of the act of March 18, 1881, entitled An act supplementary to the act relating to

cities of the first class, having a population exceeding one hundred and fifty thousand inhabitants,' passed May 4, 1869, 78 O. L., page 58, at any sale of the lessee company's property in any judicial proceeding to bid for and acquire such property, and the said bid shall be applied as a credit upon any debt of said lessee company found to be due and owing such city on account of such lease and mortgage. And in case it shall become necessary to incur expense in carrying out the provisions of this section, the said trustees are hereby authorized and empowered to borrow such sum as may be necessary for said purpose, and to issue bonds therefor payable both as to principal and interest in lawful money of the United States at such times and places and in such sums as shall be deemed best by the trustees of such railway. Said bonds shall be signed and attested in the same manner as the bonds authorized by the act to which this is supplementary. Said bonds shall bear a rate of interest not to exceed four per cent. per annum, and be secured by a pledge of the faith of the city, and a tax in addition to all other taxes for municipal purposes, which shall be annually levied by the council or board of legislation of said city sufficient to pay the interest and provide a sinking fund for their final redemption.

" 'SECTION 7. In case the said trustees acquire said lessee company's property by purchase, as provided in the preceding section, or by forfeiture, they shall have power, with the approval of the trustees of the sinking fund, to license the right to use and operate the said line of railway until a lease shall be made thereof, and they shall, as soon as practicable, lease the line of railway to such person or company, as shall organize or may be organized under the provisions of section 3838, Revised Statutes, as will conform to the terms and conditions to be fixed in a form of lease by said trustees, which form shall be subject to the approval of the trustees of the sinking fund of such city; provided, that before making such lease said trustees shall invite propositions for same in accordance with the form aforesaid by advertisements for such length of time and in such newspapers as shall be prescribed by the trustees of said railway and the trustees of the sinking fund of such city; provided, further, that no award of a lease shall be made nor shall possession be delivered thereunder until approved by the said trustees of the sinking fund. And provided, further, that no lease of said railway shall be made until the question of making such lease of said railway shall be submitted to the vote of the qualified electors of said city at a general election held in said city after an award as aforesaid. The mayor of said city shall, upon

[COPYRIGHT. 1901, BY CARL G. JAHN.]

notice given him of an award of lease as aforesaid, give at least twenty days' notice of the time of holding such election to the qualified electors of said city. The vote shall be taken at the usual place of holding elections in each precinct and ward of said city, and in the usual manner of holding state and municipal elections, and the ballots for such election shall have printed thereon the words: 'shall the ——— be leased? Yes. no.' (Inserting in said blank space the name of the said line of railway). And no such lease shall be binding or take effect unless a majority of all the votes cast upon the question at said election shall be cast in favor thereof. The returns of said election shall be made to the board of elections of said city, which shall canvass the same and report the result to the mayor thereof; and if the majority of the electors voting upon the question at such election shall have voted in favor of said lease, the said boards of trustees are hereby authorized to execute the same upon the terms and conditions fixed in the form thereof hereinbefore provided."

"That by the first section of the act of the general assembly of the state of Ohio hereinbefore referred to as passed on April 22, 1898, the said board of trustees of the Cincinnati Southern Railway was authorized, with the approval of the trustees of the sinking fund of said city, to agree with the lessee of said Cincinnati Southern Railway to modify the terms and extend the time of grant in the lease aforesaid thereof, for such length of time and upon such terms and conditions as should be fixed and provided by said board of trustees; provided, however, that no modification or extension of said lease should be made until the question of making such extension or modification should be submitted to a vote of the qualified electors of said city in the manner provided in said first section aforesaid after making the agreement aforesaid.

"Acting under the terms of the said first section of the last mentioned act, and after conference with the officers of the said lessee company, certain modifications of the existing lease of said railway including an extension of the time of grant thereof were prepared and adopted by the board of trustees of said railway on December 1, 1900, and thereafter submitted to the lessee company, but said company by a communication dated December 17, 1900, and addressed to the board of trustees and presented on December 22, 1900, declined to accept an extension of said lease upon the terms and conditions fixed by the said board of trustees, which communication was ordered filed and the secretary directed to advise the lessee company of said action.

"That on December 22, 1900, the board of trustees of the said railway passed the following resolution: Resolved, by the board of trustees of the Cincinnati Southern Railway that under and by virtue of the authority of section second of the act of the general assembly of Ohio, passed April 23, 1898, 93 O. L., 637, entitled 'An act supplementary to an act relating to cities of the first class having a population exceeding one hundred and fifty thousand inhabitants passed May 14, 1869, 66 O. L., 80, that there be borrowed as a fund for terminal facilities and permanent betterments of the Cincinnati Southern Railway the sum of $500,000, during the year A. D., 1901, and that there be issued bonds therefor in the name and under the corporate seal of the city of Cincinnati, in the form to be hereafter adopted by this board; said bonds shall be signed and attested in the same manner as the bonds authorized by the aforesaid section second and shall be payable both as to principal and interest in the lawful money of the United States at such times and places and in such sums as shall be deemed best by this board, provided that none of said bonds shall bear a rate of interest greater than four per cent. per annum nor be sold for less than par and said board will proceed to act under the said resolutions unless restrained by order of this court, and this without submitting the question of the issuing of said bonds to a vote of the qualified electors of said city."

"The parties to this agreed case submit to the court upon the facts aforesaid, the question whether or not the said act of April 23, 1898, requires the submission of the question of the issuing of said bonds to a vote of the qualified electors of the said city, the plaintiff affirming that the said submission is necessary, the defendants denying."

The agreed statement of the facts is followed by the affidavits of both counsel that the controversy which has arisen between the parties hereto is real, and that the proceedings are taken in good faith to determine the rights of the parties.

The law which we are called upon to construe contains five grants of power to the board of trustees of the Southern railway which they are authorized to exercise under certain conditions. These grants of power may be briefly stated to be,

First. To modify the terms and extend the time of the lease of the railway.

Second. To construct terminal facilities and issue bonds for that purpose.

Third. To purchase at judicial sale the property of the lessee company including the lease under which it is operating.

Fourth. To operate the road, after such a purchase of the lease, until a new lease can be made.

Fifth. To make such new lease.

The doubts as to the true construction of the act arise in a large measure from the failure of its framers to keep the conditions precedent applicable to the exercise of each power clear and distinct from one another, thus leading to a confusion which would have been avoided had the provisions of article 2, section 16 of the constitution of Ohio been followed, which declares that "No bill shall contain more than one subject which shall be clearly expressed in its title." Our Supreme Court has held, however, that this provision of the constitution is merely directory, and that a failure to observe its provisions does not invalidate the act. We therefore proceed to inquire as to the true construction of the law with respect to the particular question in controversy.

The contention of the trustees is that one of the powers granted to them by the act is that of constructing terminal facilities; that in order to raise money to pay for the same they are authorized to issue bonds to an amount not exceeding $2,500,000, the issue in any one year not to exceed $500,000; that if said bonds are to be issued as the result of an agreement between the lessee company and the trustees, that the lessee company will pay the interest and provide a sinking fund for the payment of the principal at maturity, then the question of the issue must be submitted to a vote of the people for their approval before it is valid, but if no such agreement has been made with the lessee company then the question as to the exercise of such power rests solely in the discretion of the trustees and requires no submission to the people for their approval to make the same valid.

This contention is disputed by the city, which claims that bonds for terminal facilities can only be issued in the event of the trustees and the lessee company having entered into an agreement by which the company agrees to pay the interest and provide a sinking fund for the payment of the principal of the bonds at maturity; and that before such agreement becomes binding it must be ratified by a vote of the people.

The decision of the controversy turns upon the construction of the following paragraph of section 4: "And no bonds shall be issued under this act unless a majority of all the votes cast upon the question at said election shall be cast in favor thereof."

Construing this paragraph in connection with all the remainder of the act, it can have but one of three constructions:

First. That no bonds can be issued under the act for any purpose for which the act

authorizes the issue of bonds, unless the issue receives the approval of a majority of the people voting on the question at an election at which the question is submitted to them.

Second.    That the trustees have power to issue bonds upon the happening of one of three contingencies;

(1.)    When under section 6 in the judgment of the trustees it is necessary to purchase the property of the lessee company at judicial sale.

(2.)    When the trustees decide to construct terminal facilities, yet have made no agreement with the lessee company for the payment, by way of additional rental, of the interest and principal of the bonds.

(3.)    When the trustees decide to construct terminal facilities and have made no agreement with the lessee company for the payment, by way of additional rental. of the interest and principle of the bonds.

In the first two contingencies the question of the issue of the bonds need not be submitted to a vote of the people.    In the third contingency it must.

This is the construction contended for by the trustees.

Third:    The third construction is the same as the second with the very important exception that it denies any right in the trustees to issue bonds in the second contingency, either with or without a vote of the people.

This is the construction for which the city contends.

The first construction, which denies to the trustees the right to issue bonds for any purpose unless the people have authorized them, by the admission of both parties is unsound, and in this opinion we concur.    We agree with counsel that if at any time it becomes necessary for the trustees to bid in the lease of the road at judicial sale for the protection of the city, and in order to raise funds sufficient for that purpose to issue bonds, it is not necessary to submit the question of such issue to the people.    Such power is given to meet an emergency.    But to authorize the trustees to make a bid at a judicial sale, and then to compel them to afterwards depend upon a vote of.the people for the issue of bonds, with which to raise the money to make good their bid, might be only granting them authority to put themselves in contempt of court, for such would be their position if the vote on the issue of bonds were unfavorable to the issue. And if they submitted the question of the issue to the people before the bid, they would be disclosing to other bidders their intention to bid and the probable maximum amount of their bid, which would operate to their disadvantage as a bidder in numerous ways.    A failure,

too, to be the successful bidder after the people by a vote had authorized the issue of a certain amount of bonds, would result in the expense of a special election, which would be a total loss to the city.

Furthermore, it appears from the act that the trustees may, without submitting the question to a vote of the people, bid the amount of the indebtedness of the lessee company to the city.    To allow them to borrow money on bonds without consulting the people would be in keeping with the same policy.    An emergency requires prompt action at the moment it arises.    All of its difficulties cannot have been foreseen.    Some one must be trusted to act, and if those who are to act are not given the latitude of discretion which sound business principles demand, the power to act is so crippled as to seriously prevent the accomplishment of the purpose for which it is given. There is a conservatism that is too conservative to conserve.

The first construction then, as has been previously stated, in our opinion is properly admitted by counsel on both sides to be unsound.

As both the second and third constructions admit that no submission to a vote of the people is necessary to an issue of bonds to raise money to purchase at judicial sale, and as both constructions admit that when the lessee company has agreed to pay the interest by way of additional rental on bonds issued for terminal facilities, the question of the issue must be submitted to a vote of the people (section 4), the sole remaining questions of construction are,

(1.)    Have the trustees power to issue bonds for terminal facilities when the lessee company has not agreed to pay the interest on the bonds by way of additional rental?    And, (2.) if so, must the question of the issue be submitted to a vote of the people?    If the first question is answered in the affirmative, we must consider the second, but if the first question is answered in the negative, the second question requires no answer because it does not arise.

If section 2 stood by itself there could be no possible doubt of the power of the trustees to issue bonds for terminal facilities without submission of the question to a vote of the people. We find in that section an absolute and unqualified grant to them of such power.

Section 3 seems to enter upon a new subject.    It grants the power to the trustees to agree with the lessee of the railway to exercise the power given to the trustees in section 2, on condition that the lessee company will enter into a supplemental agreement with the trustees, by which the lessee company will obligate itself as and by way of additional

rental for the railway to pay the trustees such sum annually as will equal the interest charge upon such bonds and provide a sinking fund for their redemption at maturity.     .

Section 4 continues the same subject, and provides that "upon making the agreement provided for in section 3 it shall be submitted to the trustees of the sinking fund * * * for their approval.     If the said trustees of the sinking fund approve said agreement, or if they fail so to do within ten days thereof, notice thereof shall be given by the trustees of the railway to the mayor of the city.  * * * The mayor of said city shall thereupon submit the question of the issuance of the bonds provided for in section 2 of this act to a vote of the qualified electors of said city at a general election held in said city."

And after describing the manner in which the election shall be held the section declares: "And no bonds shall be issued under this act unless a majority of all votes cast upon the question at said election shall be cast in favor thereof."

The construction which finds in section 3 and 4 no limitation upon the absolute grant in section 2 encounters an inexplicable inconsistency in the legislative intent which requires a vote of the people to validate an issue, the payment of the interest and principal of which the lessee company has agreed to guarantee; but which grants an absolute right to issue the bonds without such vote, in case no such agreement of guaranty is entered into.

If it were possible to imagine any ground of explanation for such an inconsistency of legislative purpose, we should give a careful consideration to it before rejecting it, but as we have failed to find any such imaginable ground, we are driven irresistibly to the conclusion that no such inconsistency exists in the act, and that therefore the construction which imposes it upon the act is unsound.

Unless we can find then in some part of the act a requirement that the bonds issued under section 2 for terminal facilities must be validated by a vote of the people, we must reject the construction which makes it an independent grant of power not dependent on any conditions except the exercise of the discretion of the trustees of the railway.

Such requirement if it exist, must be found in the paragraph in section 4 which declares "And no bonds shall be issued under this act unless a majority of all votes cast upon the question at said election shall be cast in favor thereof."

But the word "said" which precedes "election" refers undoubtedly to the election which has been previously referred to in section 4, the election at which is submitted to the voters

the question whether bonds for terminal facilities shall be issued when the lessee company has agreed to guarantee the payment of the interest and principal, and the paragraph, therefore, has not a general and sweeping application, but has reference only to the particular exigency to which it is referring.

Furthermore, to assume an independent grant of power to the trustees in section 2 and a requirement for an election in the paragraph under consideration before the power could be exercised would necessarily require that in place of the word "said" which precedes the word "election" we should find the article "an;" but we would not be warranted in forcing such a reading of the paragraph unless from the other parts of the act such forced conclusion were made necessary; for if possible statutes must be read as they are written, and a construction given which harmonizes with the language employed.     Is it not possible to find such a construction?

If we reject the theory that section 2 is an absolute grant of power and consider it merely as a grant preliminary to the subsequent and connected grants of power found in sections 3 and 4, and therefore not to be operative except as a part of those sections, all difficulties of construction of the paragraph referred to disappear.

Reading the three sections together then as expressive of a single purpose, we find that purpose to be a provision for enabling the trustees to enter into an agreement with a leasing company, by which agreement the trustees agree to construct terminal facilities for the railway and to issue bonds for such purpose to an amount not exceeding two million five hundred thousand dollars, of which amount not more than five hundred thousand are to be issued in any one year.     By the same agreement the lessees of the railway each year are to pay to the trustees an amount, by way of additional rental, sufficient to pay the interest upon the bonds and provide a sinking fund for the redemption of the bonds at their maturity; the bonds not to be valid and binding, however, until the question of the issue of the bonds shall have been submitted to the people of Cincinnati and shall have received their approval.     With such a construction of sections 2, 3 and 4 the words in section 4, "And no bonds shall be issued under this act unless a majority of all the votes cast upon the question at said election shall be cast in favor thereof" are entirely harmonious, and receive their plain, ordinary and natural meaning; while under no other construction is this true. We have found therefore the true construction.

The contention that section 2 is not to be considered an independent section modified

only by the paragraph in section 4 to which we have referred, receives confirmation, too, in the circumstance that the act fails to provide any manner for holding an election which such a construction would involve neither the details as to notice, form of ballot or canvass of the vote being provided, for, whereas in all other cases in the act in which an election is required, viz.: (1.) When the lease is to be modified and extended; (2.) when bonds are to be issued for terminal facilities after an agreement by the lessees to pay the interest and principal of the same, and (3.) when a new lease is to be made after the property has been acquired by the trustees by a purchase at judicial sale or forfeiture of a former lease; all of the details of notice, form of ballot and canvass of the vote are provided for.

It is improbable, too, that the act would permit bonds to the amount of two million five hundred thousand dollars to be issued by the board of trustees without concurrence of the sinking fund trustees, when the same act requires the concurrence of the latter board to make valid (1.) the modification of the lease, (2.) the issue of bonds for terminal facilities when the same are to be paid by the lessee company, (3.) the license to operate the road after purchase or forfeiture until a new lease is entered into, and (4.) the new lease of the road after it has come into the hands of the trustees by purchase at judicial sale or forfeiture.

The only reasonable explanation of the omission of the act to require any such concurrence is that its framers never contemplated the grant of any such power to the trustees.

And finally, the grant of such power to the trustees would be in conflict with the general legislative policy which has always been followed whenever the question of issuing bonds for the benefit of the railway was to be determined, for such policy has been to require the consent of the people to the issue before authorizing it to be made. Thus in 1869 when the question was whether the city should enter upon the great work of constructing a railway to the south and of issuing ten million dollars or bonds to pay for the same, the question was submitted to a vote of the people: in 1876, the question of the issue of six millions of additional bonds was submitted to a vote of the people; and in 1878, the question of the issue of two millions of additional bonds was twice submitted to a vote of the people.

The only exception to this policy is the act of 1880, which permitted the board of trustees to issue three hundred thousand dollars of bonds for terminal facilities without submitting the question of the issue to a vote of the people, but required the concurrence of the board of sinking fund trustees. But this exception to the general policy by which a comparatively small amount of bonds was authorized to be issued without a vote of the people cannot be said to indicate any change of legislative policy where the amount involved runs into the millions.

We recognize, too, the soundness of such legislative policy, and believe that in all instances in which an act of the legislature seeks to impose upon a community a large amount of bonded indebtedness, all doubtful words and phrases with respect to the question as to whether the issue is to be submitted to a vote of the people or not should be construed in favor of such a submission.

For the reasons stated, the plaintiff will be granted an order of injunction perpetually restraining the defendants from issuing any bonds under the resolution of December 22, 1900.

Charles J. Hunt, and Wade Ellis, corporation counsel, for city of Cincinnati.

W. T. Porter, for board of trustees Cincinnati Southern Railway.